**HAGENS BERMAN SOBOL SHAPIRO LLP**
Reed R. Kathrein (SBN 139304)
Lucas E. Gilmore (SBN 250893)
715 Hearst Avenue, Suite 300
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

*Liaison Counsel for Plaintiff*

**LABATON KELLER SUCHAROW LLP**
Francis P. McConville (NY Bar No. 5961867)
(*pro hacvice forthcoming*)
Connor Boehme (NY Bar No. 5961867) (*pro hac vice forthcoming*)
140 Broadway
New York, New York 10005
Telephone: 212-907-0700
Facsimile: 212-818-0477
fmcconville@labaton.com
cboehme@labaton.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BOSTON RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | Case No.  **'25CV3284 WQHKSC** |
| | CLASS ACTION |
| Plaintiff, | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| DEXCOM, INC., KEVIN R. SAYER, JACOB S. LEACH, JEREME M. SYLVAIN, and SEAN CHRISTENSEN, | DEMAND FOR JURY TRIAL |
| Defendants. | |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**INTRODUCTION**

Plaintiff Boston Retirement System ("Plaintiff"), individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through counsel, which included, among other things, a review of the public U.S. Securities and Exchange Commission ("SEC") filings of DexCom, Inc. ("DexCom" or the "Company"), Company press releases, conference call transcripts, investor presentations, analyst and media reports, and other public reports and information regarding the Company. Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein, which evidence will be developed after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.  This is a class action brought on behalf of a "Class" of all persons and entities who purchased or otherwise acquired DexCom securities between January 8, 2024 and September 17, 2025, inclusive (the "Class Period"). Plaintiff brings this action seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, promulgated thereunder.

2.  DexCom, headquartered in San Diego, California, is a medical device company that manufactures continuous glucose monitoring systems ("CGMs") for diabetes management. DexCom's major CGM products include the Dexcom G6 ("G6") and Dexcom G7 ("G7") CGM systems, which DexCom launched in 2018 and 2023, respectively.

3.  This action is about how Defendants falsely touted the efficacy and safety of their CGMs, while intentionally concealing pervasive accuracy failures that endangered patients and fundamentally impaired the device's commercial viability and regulatory compliance. Defendants concealed these issues throughout the Class Period, even as the truth gradually emerged between July 2024 to September 2025

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

through a series of disclosures, including regulatory warnings, product-related announcements, and disappointing financial results.

4.    Throughout the Class Period, Defendants failed to disclose that: (i) DexCom had made material design changes to the G6 and G7 unauthorized by the U.S. Food and Drug Administration (the "FDA"); (ii) these design changes rendered the G6 and G7 less reliable than their prior iterations, presenting a material health risk to users relying on those devices for accurate glucose readings; (iii) these issues subjected DexCom to an increased risk of heightened regulatory scrutiny and enforcement action as well as significant legal and reputational harm; (iv) based on the foregoing, the Company's CGM sales were negatively impacted; and (v) as a result, Defendants' public statements about the reliability, accuracy, safety, and functionality of their CGMs as well as their financial forecasts were materially false and/or misleading at all relevant times.

5.    Defendants' fraud was revealed to the market through a series of disclosures beginning on July 25, 2024 when DexCom reported lower-than-expected revenue for the second quarter of 2024 and cut its full-year revenue forecast. Defendants attributed these disappointing results to problems related to its CGM products, including the G7.  On this news, DexCom's stock price fell $43.85 per share, or 40.7 percent, to close at $64.00 per share on July 26, 2024.

6.    On March 7, 2025, DexCom disclosed that it had received a warning letter (the "Warning Letter") from the FDA related to concerns about manufacturing processes and quality management systems at its facilities.  On this news, DexCom's stock price fell $7.12 per share, or 9.15 percent, to close at $70.72 per share on March 10, 2025.

7.    On March 25, 2025, the FDA published the Warning Letter on its website, revealing that DexCom had "adulterated" its G6 and G7 products by "modif[ying] the G6 and G7 sensors" without prior regulatory approval, thereby subjecting the devices to "larger inaccuracies" that "cause higher risks for users who rely on the sensors to

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

dose insulin or make other diabetes treatment decisions." On this news, DexCom's stock price fell $3.19 per share, or 4.24 percent, over two trading sessions, to close at $72.13 per share on March 26, 2025.

8.  On September 18, 2025, Hunterbrook Media, an investigative news outlet, issued a report (the "Hunterbrook Report") describing accuracy problems with DexCom's G7 device which have resulted in serious medical problems for patients. On this news, DexCom's stock price fell $8.99 per share, or 11.8 percent, over the following two trading sessions to close at $67.45 per share on September 19, 2025.

9.  As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.  The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

11.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

12.  Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because DexCom is headquartered in this District, and because many of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of materially false and misleading information, occurred in this District.

13.  In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**PARTIES**

14.    As indicated on the certification submitted herewith, Plaintiff purchased shares of DexCom securities at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

15.    DexCom, Inc. is a Delaware corporation with its principal executive offices located at 6340 Sequence Drive, San Diego, CA 92121.  During the Class Period, the Company's common stock traded on the NASDAQ Global Select Market (the "NASDAQ") under the symbol "DXCM."

16.    Defendant Kevin R. Sayer was, at all relevant times, Chairman of the Board of Directors and Chief Executive Officer of DexCom.  As of September 14, 2025, Defendant Sayer has been on medical leave.

17.    Defendant Jacob S. Leach has served as DexCom's Chief Operating Officer at all relevant times. Defendant Leach has also served as DexCom's President since May 9, 2025, as well as the Company's interim principal executive officer since September 14, 2025.

18.    Defendant Jereme M. Sylvain has served as DexCom's Executive Vice President and Chief Financial Officer at all relevant times.

19.    Defendant Sean Christensen has served as Dexcom's Vice President of Finance and Investor Relations at all relevant times.

20.    Defendants Sayer, Leach, Sylvain, and Christensen are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of DexCom's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

21. DexCom and the Individual Defendants are collectively referred to herein as the "Defendants."

22. DexCom is liable for the acts of the Individual Defendants, and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

23. The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to DexCom under *respondeat superior* and common law agency principles.

## COMPANY BACKGROUND

24. DexCom develops, manufactures, and distributes CGM systems for diabetes management. DexCom's G7 CGM model, designed and distributed as an upgrade over the prior G6 model, received clearance to be sold to people with diabetes in the European Union in early 2022. Thereafter, the Company began to sell the G7 in multiple European countries. The G7 was approved for use in the United States in December 2022 and commercially launched there in early 2023.

## MATERIAL MISREPRESENTATIONS AND OMISSIONS
## DURING THE CLASS PERIOD

25. The Class Period begins on January 8, 2024, when Defendant Sayer presented at the JPMorgan Healthcare Conference. During the conference, Defendant Sayer claimed that G7 is "a great platform." He also called the G7 "the most accurate sensor on the market today and the most accurate sensor that's ever been produced by us."

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

26.    Then, on a February 8, 2024 investor call to discuss the Company's financial results for the year ended December 31, 2023, Defendant Sayer claimed that "G7 is the most accurate CGM ever launched and the market's reception to G7 has been exceptional.  Customers and clinicians have been thrilled with the new form factor, product performance and ease of use."  He also attributed G7's success largely to "the accuracy of our sensor."

27.    During the same call, Defendant Sylvain represented that "the performance in the back half of the year, a lot of that has to do with being the most accurate sensor launching with the G7 form factor."  He continued that "having the most advanced sensor on the market is the driver" in taking market share.

28.    Also on February 8, 2024, DexCom filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2023 (the "2023 10-K").  In the 2023 10-K, Dexcom touted the accuracy of the G7 as a competitive advantage, stating that "Dexcom G7 is the most accurate CGM cleared by the FDA," and that "the capability to measure very low levels of an electrical signal and to accurately translate those measurements into glucose values is also a unique and distinguishing feature of our technology."

29.    Then, during a presentation at the Raymond James Institutional Investors Conference on March 5, 2024, Defendant Christensen expressed that the "significant growth" that the Company was expecting in 2024 was based on the "excellent product" that Dexcom had in the G7.  He told investors that the G7 was the "standard in CGM technology around the world," and "the most accurate CGM that has been cleared by the FDA," which offers "that standard Dexcom performance that people have come to expect and trust over the years."

30.    On an April 25, 2024 earnings call to discuss the Company's financial results for the quarter ended March 31, 2024, Defendant Sayer claimed that the Company's positive momentum since the launch of the G7 "can be directly attributed

to our product performance and innovative features." He further claimed that the G7 "extended our leadership in sensor accuracy."

31. During the June 5, 2024 William Blair Growth Stock Conference, Defendant Sylvain claimed the G7 was "the most accurate sensor on the market."

32. The statements contained in ¶¶ 25-31 were materially false and misleading because Defendants made them while failing to disclose that: (i) DexCom had made material design changes to the G6 and G7 unauthorized by the FDA; (ii) these design changes rendered the G6 and G7 less reliable than their prior iterations, presenting a material health risk to users relying on those devices for accurate glucose readings; (iii) these issues subjected DexCom to an increased risk of heightened regulatory scrutiny and enforcement action as well as significant legal and reputational harm; and (iv) based on the foregoing, the Company's CGM sales were negatively impacted; (v) as a result, Defendants' public statements about the reliability, accuracy, safety, and functionality of their CGMs as well as their financial forecasts were materially false and/or misleading at all relevant times.

**THE TRUTH BEGINS TO EMERGE AS**
**<u>DEXCOM CONTINUES TO MISLEAD INVESTORS</u>**

33. Investors learned about Defendants' fraud in a series of disclosures beginning on July 25, 2024 when DexCom reported lower-than-expected revenue for the second quarter of 2024 and cut its full-year revenue guidance. Defendants attributed these disappointing results to problems related to sales of their CGM products, including the G7.

34. For instance, on a July 25, 2024 earnings call to discuss the Company's results for the quarter ended June 30, 2024, Defendant Sayer stated that DexCom was "short a large number of new patients as to where we thought we would be at this point in time."

35. On this news, DexCom's stock price fell $43.85 per share, or 40.7 percent, to close at $64.00 per share on July 26, 2024.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

36.     Despite this revelation, Defendants continued to mislead investors by touting the quality and accuracy of DexCom's CGM products and the success of the G7's rollout.  For instance, on the same July 25, 2024 call, Defendant Sayer touted the Company's purported enhancements to the G7, stating, in relevant part: "We've built upon the performance of G7, making it even better.  This includes a continuation of our monthly cadence of software updates, which included the second-quarter additions of medication logging and the ability to ingest activity data into our G7 app."

37.     On the same call, Defendant Sylvain touted DexCom's enhancements to the G7, stating: "We continue to see further migration of our customer base from G6 to G7 in the second quarter as we finalize new pump integrations and transition DexCom ONE to the G7 form factor."

38.     Also on July 25, 2024, DexCom filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its quarter ended June 30, 2024 (the "Q2 2024 10-Q").  This report represented that DexCom's product development activities "are focused on improved performance and convenience" and "enabl[ing] intelligent insulin administration."

39.     Appended as exhibits to the Q2 2024 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Sayer and Sylvain certified, in relevant part, that the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

40.     On an October 24, 2024 earnings call to discuss the Company's results for the quarter ended September 30, 2024, Defendant Sylvain stated: "We've made significant progress in transitioning our installed base to the G7 form factor with new pump integrations . . . .  This has enabled us to further scale our high-volume manufacturing facilities, which positions us well as we work towards our long-term cost targets."

41.    On the same call, in response to a question regarding DexCom's competitive advantages, Defendant Sayer stated, in relevant part:

> [W]e serve, several hundred thousand AID [automated insulin delivery] system users right now. A**nd the results of those AID systems with our partners have been incredibly good.** We work very closely with them on a regular basis to talk about the new features we're about to bring on board. ***We update our hardware and our app experience, our interfaces with them on a regular basis to enrich the experiences of their customers, and we believe we do that better than anybody else.*** Over time, our reputation in this market and one of the places we've been always strong is in this type 1 market because that has been where we have had the largest market share advantage for a very long time and ***we intend to maintain that through the higher quality of our product . . . . The accuracy of DexCom is tried and true and proven to these patients.*** I've been to several -- it's kind of diabetes fundraiser season. I've been to a few fundraiser things that I've seen numerous Omnipod and Tandem users, who are now using G7. Certainly, the Tandem ones and the Omnipod ones are starting to switch. Their belief in DexCom and our sensors is incredibly heartwarming and it's very important to see that is a great customer base for us, a***nd we'll continue to serve it the same way we always have.***[1]

42.    Also on October 24, 2024, DexCom filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its quarter ended September 30, 2024 (the "Q3 2024 10-Q"). The Q3 2024 10-Q represented that DexCom's product development activities "are focused on improved performance and convenience" and "enabl[ing] intelligent insulin administration."

43.    Appended as exhibits to the Q3 2024 10-Q were substantively the same SOX certifications as referenced in ¶ 39, *supra*, signed by Defendants Sayer and Sylvain.

44.    During the J.P. Morgan Healthcare Conference on January 13, 2025 Defendant Sayer stated that the G7 "is a much better user experience than what we had before with G6."

45.    On January 13, 2025, DexCom issued a press release which quoted Defendant Sayer as stating:

> Dexcom made key strategic investments in 2024 that steadily progressed throughout the year, leaving us well positioned to capitalize on our growth opportunity ahead . . . . We plan to build on these investments in 2025 ***by***

---

[1] All emphasis is added unless otherwise noted.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

***further enhancing our differentiated product portfolio*** and advocating for greater CGM access globally.

46.    In a February 13, 2025 earnings call to discuss the Company's financial results for the year ended December 31, 2024, Defendant Leach stated:

> ***[W]e are always striving to enhance the accuracy and reliability of our sensors. G7 is the most accurate sensor available***, but there's still opportunities to enhance this technology and make it more accurate, more reliable for broader group of users.
>
> And so, even within the G7 platform, ***we're still working to further enhance the accuracy of that system***.

47.    On February 18, 2025, DexCom filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2024 (the "2024 10-K").  This report touted the G7 as "the most accurate CGM cleared by the FDA" with, *inter alia*, a "[p]ersonalized alert schedule [that] immediately warns the user of pending dangerous high and low blood sugar levels[,]" a "[n]ew feature [that] allows for more accurate glucose readings[,]"and an "[a]lert feature intended to predict hypoglycemia before it hits to help avoid dangerous low blood sugar events."  The report also represented that the G7 "[a]utomatically sends glucose readings to a Dexcom receiver or compatible display device every five minutes" and "is generally consistent with our prior generation CGM systems in its technical capabilities and its indications."

48.    Appended as exhibits to the 2024 10-K were substantively the same SOX certifications as referenced in ¶ 39, *supra*, signed by Defendants Sayer and Sylvain.

49.    The statements contained in ¶¶ 36-48 were materially false and misleading because Defendants made them while failing to disclose that: (i) DexCom had made material design changes to the G6 and G7 unauthorized by the FDA; (ii) these design changes rendered the G6 and G7 less reliable than their prior iterations, presenting a material health risk to users relying on those devices for accurate glucose readings; (iii) these issues subjected DexCom to an increased risk of heightened regulatory scrutiny and enforcement action as well as significant legal and reputational harm; and (iv)

based on the foregoing, the Company's CGM sales were negatively impacted; (v) as a result, Defendants' public statements about the reliability, accuracy, safety, and functionality of their CGMs as well as their financial forecasts were materially false and/or misleading at all relevant times.

50. Investors continued to learn the truth behind Defendants' misrepresentations on March 7, 2025, when DexCom filed a current report on Form 8-K with the SEC, disclosing the Warning Letter that it had received from the FDA, which related to concerns about manufacturing processes and quality management systems at certain of the Company's manufacturing facilities. Specifically, the current report stated, in relevant part:

> On March 4, 2025, the Company received a warning letter from the [FDA] following inspections of the Company's facilities in San Diego, California, and Mesa, Arizona. In the warning letter, the FDA cited deficiencies in the response letters sent by the Company to the FDA following the Form 483, List of Investigational Observations (the "Form 483"), which was delivered to the Company in connection with the inspection of the San Diego facility that occurred from October 21, 2024 through November 7, 2024, and the inspection of the Mesa, Arizona facility that occurred from June 10, 2024 through June 14, 2024.

> The warning letter describes observed non-conformities in manufacturing processes and quality management system. The warning letter does not restrict the Company's ability to produce, market, manufacture or distribute products, require recall of any products, nor restrict the Company's ability to seek FDA 510(k) clearance of new products.

> The Company takes the matters identified in the warning letter seriously, has already submitted several responses to the Form 483 and is in the process of preparing a written response to the warning letter. The Company intends to continue to undertake certain corrections and corrective actions and will also continue to provide regular updates to the FDA in response to the Form 483. The Company cannot, however, give any assurances that the FDA will be satisfied with its response or as to the expected date of the resolution of the matters included in the warning letter. Until the issues cited in the warning letter are resolved to the FDA's satisfaction, additional legal or regulatory action may be taken without further notice.

51. In reaction to this news, DexCom's stock price fell $7.12 per share, or 9.15 percent, to close at $70.72 per share on March 10, 2025.

52. Then, on March 25, 2025, during pre-market hours, the FDA published the Warning Letter on its website, revealing that DexCom had "adulterated" its G6 and

G7 products by "modif[ying] the G6 and G7 sensors" without prior regulatory approval, stating, *inter alia*:

> Our inspection revealed that **the G6 and G7 [CGM] Systems are adulterated** . . . because your firm does not have approved applications for premarket approval (PMA) in effect . . . or approved applications for an investigational device exemption . . . . The devices are also misbranded . . . because your firm introduced or delivered for introduction into interstate commerce for commercial distribution these devices **with major changes or modifications to the devices without submitting a new premarket notification to FDA, as required . . . . Specifically, your firm modified the G6 and G7 sensors** by replacing the [redacted] with [redacted] used in the [redacted] . . . . [Y]our December 3, 2024, response includes the Sensor Level Performance Equivalency of [redacted] and [redacted], **which shows a significant difference in the standard deviation (SD) of glucose sensitivities between sensors** built with [redacted] and [redacted]. This difference in SD indicates greater clinical performance variation for sensors with [redacted]. **The larger inaccuracies in [redacted]-coated sensors cause higher risks for users who rely on the sensors to dose insulin or make other diabetes treatment decisions.** Therefore, we do not agree your firm has shown equivalency between [redacted] and [redacted] to justify that such a change does not require a new premarket submission. **The variability differences could significantly affect the safety or effectiveness of the device[.]**

53.     On this news, DexCom's stock price fell $3.19 per share, or 4.24 percent, over the following two trading sessions, to close at $72.13 per share on March 26, 2025.

54.     Despite the foregoing revelations, the Company's securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions concerning, *inter alia*, the G7's reliability, accuracy, and functionality, as well as the true scope and severity of the issues and health risks posed by adulterated G7 devices.

55.     In a May 1, 2025 call to discuss the Company's financial results for the quarter ended March 31, 2025, Defendant Sayer addressed the FDA's Warning Letter, stating, in relevant part:

> This letter was related to observations made by the agency following the inspections of our San Diego and Mesa facilities during 2024. We take any FDA recommendations very seriously. So our team immediately began instituting corrective actions to address these observations. While we were disappointed to receive a warning letter, I'm incredibly proud of how our teams have rallied together with a thorough review and response, and we look forward to working together with the FDA to further strengthen our systems and processes.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

As one example of our ongoing collaboration with the agency, we were excited to recently announce FDA clearance for our 15 Day Dexcom G7 System. This marks another innovation milestone for our company as our 15 Day product advances both wear time and accuracy levels for G7 with performance data demonstrating an MARD of 8.0%, this sets a new bar in the industry in terms of sensor accuracy.

56.    In response to an analyst's inquiry regarding potential negative consequences stemming from the FDA's Warning Letter and DexCom's resolution of the agency's concerns, Defendant Leach stated, *inter alia*:

[W]e are basically working to implement a number of process controls. We already did quite a bit after the FDA came in and audited . . . . The warning letter doesn't restrict submissions and approvals of new technologies, devices and/or it doesn't restrict distribution at all. Just basically, there's a number of things we have to continue to work with the FDA to ensure we address all their concerns. So it's a big focus for us and so we've got a number of dedicated resources ensuring that, that is done, but it doesn't restrict us at all.

57.    Also on May 1, 2025, DexCom filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its quarter ended Mach 31, 2025 (the "Q1 2025 10-Q").  The Q1 2025 10-Q continued to represent, in relevant part, that DexCom's product development activities "are focused on improved performance and convenience" and "enabl[ing] intelligent insulin administration."

58.    The Q1 2025 10-Q also purported to warn of risks that "may" or "could" materialize from the deficiencies identified in the FDA's Warning Letter, while simultaneously downplaying the true scope and severity of the same, stating, *inter alia*:

In the warning letter, the FDA cited deficiencies in the response letters sent by us to the FDA following the Form 483, List of Investigational Observations that was delivered to us in connection with the inspection of our San Diego facility that occurred from October 2024 through November 2024, and the inspection of our Mesa, Arizona facility that occurred in June 2024. The warning letter describes observed non-conformities in manufacturing processes and our quality management system. We take the matters identified in the warning letter seriously and have already submitted responses to the Form 483 and to the FDA warning letter.

\* \* \*

The potential effect of the warning letter . . . can in some cases be difficult to quantify and ***could*** harm our reputation and cause our product sales and profitability to suffer. In addition, we believe events that ***could*** be classified as reportable events pursuant to MDR [Medical Device

13
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Reporting] regulations are generally underreported by physicians and users, and any underlying problems **could** be of a larger magnitude than suggested by the number or types of MDRs filed by us. Furthermore, our key component suppliers **may** not currently be or **may** not continue to be in compliance with applicable regulatory requirements.

\* \* \*

Later discovery of previously unknown problems with our products, including software bugs, unanticipated adverse events or adverse events of unanticipated severity or frequency, manufacturing problems, or failure to comply with regulatory requirements such as the QSR [Quality System Regulation], MDR reporting, or other post-market requirements **may** result in restrictions on such products or manufacturing processes, withdrawal of the products from the market, voluntary or mandatory recalls (through corrections or removals), fines, suspension of regulatory approvals, product seizures, injunctions, the imposition of civil or criminal penalties, or criminal prosecution.

Plainly, the foregoing risk warnings were generic, catch-all provisions that were not tailored to Defendants' actual known risks regarding the deficiencies identified in the Warning Letter, much less issues specific to adulterated G7 devices, such as patient injury or death resulting from those devices' inability to reliably provide accurate glucose readings.

59.     Appended as exhibits to the Q1 2025 10-Q were substantively the same SOX certifications as referenced in ¶ 39, *supra*, signed by Defendants Sayer and Sylvain.

60.     On a July 30, 2025 earnings call to discuss the Company's financial results for the year ended June 30, 2025, Defendant Leach stated that "we need to continue to ensure that we are building sensors that are both reliable, accurate and continue to push that boundary because it's so important for the users."

61.     On the same call, in discussing DexCom's progress in addressing the FDA's concerns in the Warning Letter, Defendant Leach stated, in relevant part:

Things have been going really well with the FDA. We responded rapidly to the warning letter and their concerns. And we've been giving them periodic updates. We've made quite a bit of updates to our processes and documentation, addressing much of what the FDA's concerns were. And so we still have work to do there, but we've been making fantastic progress there.

62.    Also on July 30, 2025, DexCom filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its quarter ended June 30, 2025 (the "Q2 2025 10-Q"). The Q2 2025 10-Q continued to represent, in relevant part, that DexCom's product development activities "are focused on improved performance and convenience" and "enabl[ing] intelligent insulin administration."

63.    The Q2 2025 10-Q also contained substantively the same generic, boilerplate risk warnings as referenced in ¶ 58, *supra*, which purported to warn of risks "may" or "could" materialize from the deficiencies identified in the FDA's Warning Letter, while simultaneously downplaying the true scope and severity of the same. These risk warnings were not tailored to Defendants' actual known risks regarding the deficiencies identified in the Warning Letter, much less issues specific to adulterated G7 devices, such as patient injury or death resulting from those devices' inability to reliably provide accurate glucose readings.

64.    Appended as exhibits to the Q2 2025 10-Q were substantively the same SOX certifications as referenced in ¶ 39, *supra*, signed by Defendants Sayer and Sylvain.

65.    During the Wells Fargo Healthcare Conference held on September 3, 2025, Defendant Leach claimed, in response to a question regarding the G7's reliability and accuracy "if you look at our metrics, things like warranty replacement, complaint rate, performance of the sensor, accuracy, all of that has continued to improve over time and we haven't seen anything that has changed that trajectory."

66.    The statements contained in ¶¶ 55-65 were materially false and misleading because Defendants made them while failing to disclose that: (i) DexCom had made material design changes to the G6 and G7 unauthorized by the FDA; (ii) these design changes rendered the G6 and G7 less reliable than their prior iterations, presenting a material health risk to users relying on those devices for accurate glucose readings; (iii) these issues subjected DexCom to an increased risk of heightened regulatory scrutiny

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

and enforcement action as well as significant legal and reputational harm; and (iv) based on the foregoing, the Company's CGM sales were negatively impacted; (v) as a result, Defendants' public statements about the reliability, accuracy, safety, and functionality of their CGMs as well as their financial forecasts were materially false and/or misleading at all relevant times.

### THE TRUTH IS FURTHER REVEALED

67.     The truth about the problems with DexCom's CGM products was further revealed on September 18, 2025 when, during pre-market hours, Hunterbrook published a report addressing DexCom, entitled "Dexcom's Fatal Flaws."  The Hunterbrook Report revealed, among other things, that issues and health risks posed by adulterated G7 devices were more severe and widespread than previously disclosed, stating, *inter alia*:

**G7 users have been hospitalized and died:** Billy Sosbe lost his life in June after his G7 gave him incorrect glucose readings. Diana Bates Knight's six-year-old daughter was rushed to the ER when her G7 misread her blood sugar by hundreds of points. Bob Hawkinson passed out behind the wheel when his G7 failed to alert him to dangerously low blood sugar. These aren't isolated incidents. More than a dozen other G7 users interviewed by Hunterbrook said they felt betrayed by a technology that had once been life-changing. According to a law firm investigating the G7 following a recall and FDA warning letter, at least 60 people claim to have been hospitalized and multiple others allege death connected to G7 issues. A Facebook group for G7 problems exploded to more than 58,000 members in just over one year.

(Emphasis in original.)

68.     The Hunterbrook Report found that DexCom had prioritized its margins over safety, citing comments from the Company's former employees, stating, *inter alia*:

**Dexcom staff say corporate culture put margins over safety, eroding trust in the brand:** Former employees described safety concerns in a rush to launch the G7 to compete with Abbott. Leadership of the team responsible for a component flagged by the FDA had inadequate credentials with a "very low" technical level according to a former scientist. The former senior director of manufacturing at the company's critical Mesa, Arizona, plant said "Dexcom definitely dropped the ball" and "the arrogance of Dexcom is really what needed to be reset." Another former executive said Dexcom compromised the product trying to "hold on to large revenue margins." Multiple former employees told

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Hunterbrook the G7's problems are symptomatic of a deeper struggle: an innovative company floundering to keep alive a growth story demanded by Wall Street amid a series of headwinds.

(Emphasis in original.)

69.     The Hunterbrook Report also found that doctors were becoming increasingly concerned with the G7's safety, prompting some to stop recommending the device altogether:

**Doctors raise alarms:** Hunterbrook spoke with endocrinologists across the country. While all reported imperfections with [CGMs] generally, several highlighted issues with the G7 in particular. They noted disproportionate sensor inaccuracies, repeated device failures, connectivity issues, and problems with the adhesive. Two said when they spoke with Dexcom representatives, the company expressed surprise or "didn't know anything," a phenomenon one doctor said was tantamount to "gaslighting." Others told Hunterbrook they have stopped putting patients on the G7 altogether.

(Emphasis in original.)

70.     In addition, the Hunterbrook Report expanded on the disclosures in the FDA's Warning Letter:

**Dexcom incorporated materials into the G7 that it knew were worse by "every accuracy metric," according to FDA documents:** In December 2023, Dexcom switched the coating of G7 sensors from an outsourced material to an in-house formulation. FDA inspection documents obtained by Hunterbrook show Dexcom's internal studies demonstrated the new material could lead to "differences in accuracy" that may affect insulin dosing. Despite its own tests failing to show equivalence with the original component, Dexcom sold the product anyway — without proper regulatory clearance. The FDA cited Dexcom with a violation for making this unauthorized change to a "critical raw ingredient" and declared the devices "adulterated." Complaints about the G7's accuracy were far greater for devices manufactured after Dexcom changed the material in December 2023, according to Hunterbrook's analysis of FDA data.

(Emphasis in original.)

71.     Following Hunterbrook's publication of its report, DexCom's stock price fell $8.99 per share, or 11.8 percent, over the following two trading sessions, to close at $67.45 per share on September 19, 2025.

72.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## CLASS ACTION ALLEGATIONS

73.    Plaintiff brings this class action under Federal Rule of Civil Procedure 23 on behalf of themselves and a class of all persons and entities who purchased or otherwise acquired DexCom securities during the Class Period (the "Class"). Excluded from the Class are Defendants, their agents, directors and officers of DexCom, and their families and affiliates.

74.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of October 23, 2025, there were 390,016,272 shares of DexCom common stock outstanding, owned by thousands of investors. Throughout the Class Period, DexCom stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by DexCom or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

75.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members, include:

        (a)    Whether Defendants violated the Exchange Act;

        (b)    Whether Defendants omitted and/or misrepresented material facts;

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the price of DexCom securities was artificially inflated; and

(f)     The extent of damage sustained by members of the Class and the appropriate measure of damages.

76.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

77.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in securities class actions.  Plaintiff has no interests that conflict with those of the Class.

78.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   Joinder of all Class members is impracticable.

## **ADDITIONAL SCIENTER ALLEGATIONS**

79.     As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the documents and public statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding DexCom, and their control over and/or receipt and/or modification of DexCom's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

80.     Defendants knew or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

81.     The Individual Defendants, because of their positions with DexCom, controlled the contents of DexCom's public statements during the Class Period. The Individual Defendants were each provided with or had access to the information alleged herein to be false and misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the investing public and that the positive representations that were being made were false and misleading. As a result, each of the Individual Defendants is responsible for the accuracy of DexCom's corporate statements and is, therefore, responsible and liable for the representations contained therein.

## LOSS CAUSATION/ECONOMIC LOSS

82.     During the Class Period, as detailed herein, DexCom and the Individual Defendants made false and misleading statements and omissions and engaged in a scheme to deceive the market. These false and misleading statements and omissions artificially inflated the price of DexCom securities and operated as a fraud or deceit on the Class. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of DexCom securities fell significantly. As a result of their purchases of DexCom securities during the Class Period, Plaintiff and the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

83.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's securities traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Plaintiff and other members of the Class purchased DexCom securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

84.    At all relevant times, the market for DexCom securities was efficient for the following reasons, among others:

(a)    as a regulated issuer, DexCom filed periodic public reports with the SEC;

(b)    DexCom regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)    DexCom was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace; and

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

       (d)    DexCom securities were actively traded in an efficient market, including its common stock that was traded on the NASDAQ, under the ticker symbol "DXCM."

85.    As a result of the foregoing, the market for DexCom securities promptly digested current information regarding DexCom from publicly available sources and reflected such information in DexCom securities prices. Under these circumstances, all purchasers of DexCom securities during the Class Period suffered similar injury through their purchase of DexCom securities at artificially inflated prices and the presumption of reliance applies.

86.    Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff and the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972).

## NO SAFE HARBOR

87.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of DexCom who knew that the statement was false when made.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## COUNT I
### Violations of Section 10(b) of the Exchange Act
### and SEC Rule 10b-5 Promulgated Thereunder
### Against All Defendants

88.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

89.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

90.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

91.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of DexCom securities during the Class Period.

92.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for DexCom securities. Plaintiff and the Class would not have purchased DexCom securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

93.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of DexCom securities during the Class Period.

94.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

95.    Plaintiff repeats and realleges the allegations contained in ¶¶ 1-87 as if fully set forth herein.

96.    The Individual Defendants acted as controlling persons of DexCom within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about DexCom, the Individual Defendants had the power and ability to control the actions of DexCom and its employees.  By reason of such conduct, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the proposed Class, respectfully prays for judgment against Defendants as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with pre-judgment interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1      D.      Granting such other, further, and/or different relief as the Court deems just

2  and proper.

3                                    **JURY DEMAND**

4      Plaintiff demands a trial by jury.

5

6  Dated: November 25, 2025                    Respectfully submitted,

7

8                                              **HAGENS BERMAN SOBOL SHAPIRO LLP**

9                                              /s/ *Lucas E. Gilmore*

10                                             Reed R. Kathrein (SBN 139304)
                                               Lucas E. Gilmore (SBN 250893)

11                                             715 Hearst Avenue, Suite 300
                                               Berkeley, California 94710

12                                             Telephone: (510) 725-3000
                                               Facsimile: (510) 725-3001

13                                             reed@hbsslaw.com
                                               lucasg@hbsslaw.com

14                                             *Liaison Counsel for Plaintiff*

15

16                                             **LABATON KELLER SUCHAROW LLP**
                                               Francis P. McConville (NY Bar No. 4740338)

17                                             (*pro hac vice forthcoming*)
                                               Connor Boehme (NY Bar No. 5961867) (*pro hac vice forthcoming*)

18                                             140 Broadway
                                               New York, New York 10005

19                                             Telephone: 212-907-0700
                                               Facsimile: 212-818-0477

20                                             fmcconville@labaton.com
                                               cboehme@labaton.com

21
                                               *Counsel for Plaintiff*
22

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## CERTIFICATION

I, Timothy J. Smyth, as Executive Officer of Boston Retirement System ("Boston"), hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of Boston. I have reviewed a complaint prepared against DexCom, Inc. ("DexCom") alleging violations of the federal securities laws, and authorize the filing of this pleading and any subsequent motion for lead plaintiff appointment as needed;

2.    Boston did not purchase securities of DexCom at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.    Boston is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary. Boston fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class;

4.    Boston's transactions in DexCom securities during the Class Period are reflected in Exhibit A, attached hereto;

5.    Boston sought to serve or currently serves as a lead plaintiff or a representative party in the following class actions under the federal securities laws filed during the last three years:

> *In re Silvergate Capital Corporation Securities Litigation*, No. 3:22-cv-1936 (S.D. Cal.)
> *Vazquez v. Masimo Corporation*, No. 3:23-cv-1546 (S.D. Cal.)
> *Lemm, Jr. v. New York Community Bancorp, Inc.*, No. 1:24-cv-0903 (E.D.N.Y.)
> *Baxter v. PDD Holdings Inc. f/k/a Pinduoduo Inc.*, No. 1:24-cv-5653 (E.D.N.Y.)
> *Long v. Stellantis N.V.*, No. 1:24-cv-6196 (S.D.N.Y.)
> *Shannahan v. FTAI Aviation Ltd.*, No. 1:25-cv-0541 (S.D.N.Y.)
> *In re e.l.f. Beauty, Inc. Securities Litigation*, No. 5:25-cv-2316 (N.D. Cal.)

6.    Beyond its pro rata share of any recovery, Boston will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this **24** day of November, 2025.

Timothy J. Smyth
Executive Officer
Boston Retirement System

**EXHIBIT A**

**TRANSACTIONS IN DEXCOM, INC. SECURITIES**

| Transaction Type | Trade Date | Shares | Share Price | Cost/Proceeds |
|---|---|---|---|---|
| Purchases | 08/01/2024 | 1,410 | $69.0612 | ($97,376.29) |
| Purchases | 08/07/2024 | 3,290 | $71.9269 | ($236,639.50) |
| Purchases | 08/07/2024 | 1,400 | $69.8572 | ($97,800.08) |
| Purchases | 08/12/2024 | 1,350 | $70.9360 | ($95,763.60) |
| Purchases | 08/13/2024 | 1,450 | $71.2622 | ($103,330.19) |
| Purchases | 08/20/2024 | 2,250 | $72.9695 | ($164,181.38) |
| Purchases | 09/05/2024 | 2,100 | $68.6202 | ($144,102.42) |
| Purchases | 09/06/2024 | 500 | $67.6217 | ($33,810.85) |
| Purchases | 09/10/2024 | 550 | $68.7119 | ($37,791.55) |
| Purchases | 09/13/2024 | 550 | $69.2444 | ($38,084.42) |
| Purchases | 09/26/2024 | 2,100 | $66.9459 | ($140,586.39) |
| Purchases | 09/27/2024 | 1,100 | $67.9093 | ($74,700.23) |
| Purchases | 10/30/2024 | 2,050 | $71.6700 | ($146,923.50) |
| Purchases | 02/14/2025 | 1,900 | $88.2120 | ($167,602.80) |
| Purchases | 02/19/2025 | 900 | $89.6887 | ($80,719.83) |
| Purchases | 03/11/2025 | 5,650 | $69.9887 | ($395,436.16) |
| Purchases | 03/28/2025 | 1,200 | $67.7712 | ($81,325.44) |
| Purchases | 05/30/2025 | 3,750 | $85.8322 | ($321,870.75) |
| Purchases | 06/06/2025 | 4,900 | $86.5465 | ($424,077.85) |
| Purchases | 07/31/2025 | 4,200 | $81.0287 | ($340,320.54) |